## ANNERNEN v. PENN.*
### Patent Appeal No. 3264.

Court of Customs and Patent Appeals.
April 2, 1934.

Strauch & Hoffman, of Washington, D. C. (James A. Hoffman, of Washington, D. C., of counsel), for appellant.

Bair, Freeman & Sinclair, of Des Moines, Iowa (W. P. Bair, Will Freeman, and Earl M. Sinclair, all of Des Moines, Iowa, and Herbert J. Jacobi, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

On October 30, 1928, the appellant, Rolf Erik Annernen, filed an application in the United States Patent Office for a patent on certain improvements in devices for automatically maintaining a suitable volume of air or other gas in pressure tanks. The appellee, Albert Penn, filed an application in said office on May 13, 1929, for a patent on a similar invention. The disclosures being of like subject-matter, an interference was declared between said applications on May 2, 1930. The subject-matter of the interference was stated in one count, which was claim 12 of Penn and claim 29 of Annernen. Following the declaration of the interference, the party Penn moved to amend the issue by including further counts therein, under rule 109 of the Patent Office. Among other counts proposed by Penn for inclusion was the claim which is now count 2 of the interference; the original count having been count 1 thereof.

Said count is as follows: "2. An automatic air volume control apparatus comprising a fitting in the form of a housing, pro-

*Appellee's petition for rehearing denied May 21, 1934.

vided with means to detachably secure it in an opening in a tank, a passage in said fitting that is normally open to atmosphere at one point and extends through an element of said fitting designed for attachment to a conduit leading to means arranged to supply fluid to said tank, a second passage in a wall of said housing opening into the interior of the tank at one end and arranged adjacent the opposite end to receive a pressure gauge, a valve in said housing to control the flow of air through said first named passage, a float arm mounted in said fitting, an elongated float secured to said arm, said float being of a diameter sufficiently small to permit it to be entered through said opening in the tank, means mechanically connecting said arm and said valve, and means to seal the opening in said housing through which said arm extends, said last named means permitting substantially free actuation of said valve as said float moves in response to changes of liquid level in said tank."

Both parties took testimony, and the Examiner of Interferences thereupon awarded priority as to count 1 to the party Annernen. Penn did not appeal from this decision. Priority in the subject-matter of count 2 was awarded by the Examiner of Interferences to the party Penn, and from this decision the party Annernen appealed to the Board of Appeals, which affirmed the decision of the Examiner of Interferences. From that decision the party Annernen has appealed.

The issue in this interference has been very much simplified by the concessions of counsel. At this time there is presented but the simple issue of whether an exhibit known as Penn's Exhibit 2, introduced by the party Penn in evidence, and which is conceded to have been reduced to practice by Penn before any date of conception or reduction to practice shown by Annernen, will support count 2 of the interference. If said count does read upon Exhibit 2, it seems to be conceded that priority should have been awarded to Penn on count 2. If it does not so read, then it seems to be the concession that priority should have been awarded to Annernen. But one question therefore will be considered by us, namely, the extent of the disclosure made by Penn's Exhibit 2, and the application of said count 2 to said disclosure.

The brief of counsel for appellant thus describes the general purposes and functions of the invention here in issue: "The claim involved on this appeal defines a device for automatically controlling the volume of air over the water in the tank of a pumping system. It is essential to the correct functioning of a water supply system that substantially the same volume of air be maintained under pressure above the water in the supply tank. The device in issue does this automatically, in view of the fact that the valve for controlling the flow of air to the pump is under the control of a float, the position of which depends upon the level of water in the tank. When, for any reason, the level of water in the tank rises, so that the volume of air within the tank is reduced, the float rises and opens the valve that controls the flow of air through the pump. Accordingly, the pump draws air, as well as water, and pumps the mixture through the tank. The air collects at the top of the tank, lowering the level of water within the tank and builds up pressure above the water in the tank. When water is subsequently withdrawn from the system the level thereof drops, and, when it has reached the desired level, the float dropping with it closes the valve, shutting off the supply of air to the pump so that the pump supplies water alone to the system, until sufficient air is dissipated to cause the water level in the tank to again rise above the predetermined level, when the same cycle of operations is repeated."

Some description of the Annernen device and Exhibit 2 of Penn is necessary. Each disclosure is a device inserted through the upper wall of a water pressure tank, which device, in brief, consists of a pressure gauge and a valve for admitting air automatically into the pumping system, so that such air may be forced into the top of the tank to preserve an air pressure. Each of the devices is caused to function by means of a float attached to an arm, which arm extends through an opening in the wall of the tank, and opens the valve automatically, when it is necessary to admit such air, by means of the action of the water in raising the float.

The underlying ideas of the devices are the same, but the inventors followed somewhat different methods in accomplishing the desired result. Annernen provides a housing in which the float arm extends through the opening in the housing into the tank, and the outer end of this arm is directly connected to an air valve. As the float rises and thus raises the arm, the outer end of the arm is depressed and the air valve is opened, thus admitting air into the pump circulation. Air

is admitted from the outside, to which the valve is normally open. Water and air are prevented from escaping from the interior of the tank by means of a soldered or otherwise fastened connection between a flange on the fixture and a flexible bellows diaphragm. A pressure gauge is also connected with the interior, as a part of this same fitting. The whole device is inclosed in a housing, composed of several parts.

It will be noted that Penn, in his subsequent application, and the one now here in issue, did not adopt 'the general plan shown by him by Exhibit 2, but followed, to a very considerable degree, the same general plan which was shown by Annernen in his application, substituting, however, a flexible disk for a bellows. This will be more apparent when a brief description of said Exhibit 2 is given.

Exhibit 2 shows a fitting for insertion in the upper wall of a pressure tank, which fitting consists of a hexagonal shaped part for attachment to the wall of the tank by a screw thread. Through the center of this part, and connected with the same by brazing, or otherwise, is a brass tube extending a considerable distance into the interior of the tank. Through the center of this tube extends a rod, to the inner end of which is attached a long metal float. As the end of the float rises or falls, because of the rise or fall of the water, the rod to which it is attached is caused to oscillate back and forth accordingly. To the outer end of this oscillating rod is attached a cam. As the float rises, it causes the cam to turn, and ultimately the cam strikes against a flat spring, raises the same, opens a valve attached to said spring, and admits air to the pump circulation, through an opening normally open to the outside. As the end of the float falls, the cam is taken out of contact with the spring, and the spring then closes the valve.

The oscillating rod moves through a packing, which prevents water and air from leaving the tank by means of the opening through which the rod moves. Attached to the top of the fitting is a pressure gauge normally open to the interior air of the tank. The fitting is not entirely covered by a unitary housing, but such housing is completed by a sheet metal adjustable cap which is placed over the said valve and cam, and attached thereto by friction.

Both tribunals of the Patent Office were of the opinion that count 2 of the interference reads on the disclosure made by said Exhibit 2.

While many suggestions are made about the sufficiency of Penn Exhibit 2 to support the count, one feature alone, as it seems to this court, need be specially referred to. Without reference to other features which have been discussed, said count 2 provides, in part, "means mechanically connecting said arm and said valve." As has been shown, and as is argued by the appellant, Penn's Exhibit 2 does not include said means. There is no mechanical connection between said arm and said valve. The valve is, indirectly, moved by a cam connected with said arm, but the two are not connected to any greater extent than it might be said that a lever which at times was placed against an object to be moved is mechanically connected with such object. Each operates separately, and only affects the other when they are brought in contact by other mechanical means. The cam moved by the float strikes the spring, overcomes its resistance, and thus the valve is raised. This is a much different mechanical action than is shown by Penn's present application, where a direct mechanical connection is shown.

If the language of the count were "operative connection," or similar expression, the case might be different. In some cases, notably those involving electrical devices, a direct physical contact is not necessary. In re Fessenden, 56 F.(2d) 669, 19 C. C. P. A. 1048.

Webster's New International Dictionary, 1932, thus describes the noun "connection" and the transitive verb "connect," respectively:

"1. Act of connecting, or state of being connected; junction; union. * * *

"To join, or fasten together, as by something intervening. * * *"

Clearly, the cam and valve disclosure of Penn's Exhibit 2 does not come within the common meaning of the term "connection" as given by the lexicographer. Nor is its meaning broadened by the addition of the word "mechnical." It must, in any event, be a connection.

A somewhat similar case is found in Re Stroedter, 68 F.(2d) 741, 21 C. C. P. A. ——.

While the appealed count of this interference must be broadly construed to include all subject-matter common to both parties, there is no difficulty in this respect. The only difficulty is in attempting to fit the language of this count to Penn's Exhibit 2. The count contains certain limitations, one

of which we have just commented upon. Such limitations cannot be ignored. In re Bijur, 40 F.(2d) 999, 17 C. C. P. A. 1134; Atherton v. Payne, 54 F.(2d) 821, 19 C. C. P. A. 867.

Being of the opinion that count 2 of the interference does not read upon the disclosure of Penn's Exhibit 2, it follows that the decision of the Board of Appeals was in error, and it is hereby reversed, and priority as to count 2 of the interference is awarded to the party Annernen.

Reversed.

HATFIELD, Associate Judge, did not participate.